649 So.2d 673 (1994)
STATE of Louisiana,
v.
Craig HOPKINS, Defendant-Appellant.
No. 94-337.
Court of Appeal of Louisiana, Third Circuit.
November 2, 1994.
*674 Mark H. Kramar, for plaintiff appellee.
Jack L. Simms Jr., for defendant appellant.
Before DOUCET, PETERS and BERTRAND[*], JJ.
DOUCET, Judge.
Defendant, Craig O. Hopkins, was charged by a bill of information dated October 7, 1993, with unlawful distribution of cocaine, a Schedule II drug under La.R.S. 40:964, in violation of La.R.S. 40:967(A)(1). Defendant waived jury trial, was tried by Judge Roy B. Tuck, Jr. on November 17, 1993, and found guilty as charged. On January 28, 1994, defendant was sentenced to 210 months at hard labor with credit for time served. From the ruling of the trial court, defendant now appeals, alleging four assignments of error.

FACTS:
During the late night/early morning hours of June 18-19, 1993, Leesville police officers and three agents from the Fort Polk Criminal Investigation Division (C.I.D.) and a confidential informant (C.I.) met at the Country Inn, located in Vernon Parish. The group planned "making buys" of controlled dangerous substances from various persons in a portion of Leesville known as "the crossing area." One of the C.I.D. personnel (U.S. Army Special Agent Jackson) and the informant drove a pickup truck through the area in an attempt to make the "buys." The truck was equipped with a video camera aimed at the passenger window, for the purpose of recording events during the buys. [Agent *675 Jackson explained at trial that he conducts transactions through the passenger window, so that persons selling drugs cannot reach the ignition.] The truck was also equipped with an audio system which was monitored by a surveillance team that remained within a few blocks of Agent Jackson and the informant.
As the truck passed through the area, they made contact with an individual whom the informant initially identified as "Craig," and later identified as Craig Hopkins. According to Agent Jackson's testimony, "Craig" approached the truck, whereupon he and the C.I. asked to buy a "twenty," which is the slang term for $20 worth of crack or rock cocaine.
Agent Jackson and the defendant agreed that the truck would make the block while defendant obtained the crack from an undisclosed location. After making the block, Agent Jackson received the crack from Hopkins and paid him $20 in unmarked bills. The videotape recorded by the truck's camera shows the seller of the crack to be the defendant. Further, Agent Jackson described defendant in his testimony and identified him in court as the seller. After the transaction, Hopkins and the buyers each left the area.
Jackson returned to the command post at the Country Inn, and delivered the crack to the officer in charge, Sergeant Gore of the Leesville Police Department. Agent Jackson and Sgt. Gore took steps to secure the crack and initiated the record of the chain of custody. (Also see, infra, discussion of lab certificate.) Defendant objected to introduction of the videotape and of the crime lab certificate as each was introduced.
At the close of the State's case, the defense moved for a "directed verdict," citing La. C.Cr.P. art. 778 "Motion for Acquittal." The court denied the motion, and the defense put on its case, producing two alibi witnesses who placed defendant in another location at the time of the drug "buy." Both testified that defendant was asleep on a couch at the time. One witness was a family friend; the other was defendant's mother.

ERRORS PATENT:
La.C.Cr.P. art. 920 provides the scope of review on appeal, as follows:
The following matters and no others shall be considered on appeal:
(1) An error designated in the assignment of errors; and
(2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.
A review of the record reveals no errors patent.

ASSIGNMENTS OF ERROR:
The defendant-appellant assigns four errors. He claims the trial court erred in the following:
1) In reaching a verdict of guilty, as the State did not produce evidence proving defendant's guilt beyond a reasonable doubt.
2) In allowing the State to introduce a videotape of the transaction involving the sale of crack cocaine, when parts of the tape had not been shown to defense counsel until about one hour prior to the beginning of the trial.
3) In allowing the introduction into evidence of the certificate from the crime laboratory, over the objection of defendant.
4) In not granting a "directed verdict" of acquittal at the conclusion of the State's case in chief, which caused the defendant to have to put on witnesses and testimony, allowing the State to then call rebuttal witnesses, which it would have otherwise been unable to do.
Because Assignments # 1 and # 4 concern the sufficiency of the State's overall evidence, Assignments # 2 and # 3 (which deal with particular pieces of evidence) will be considered first.

ASSIGNMENT OF ERROR NO. 2:
By his second assignment of error, defendant contends that a portion of the police videotape of the drug transaction between investigators and defendant should not have been allowed into evidence. The defense had not seen the entire tape until approximately one hour before trial, apparently due to a *676 mistake by Sgt. Gore of the Leesville Police Department.
In its answers to defendant's discovery requests, the State had declared that defense counsel could view the tape at any time. Defendant and his counsel viewed the videotape on November 15, 1994, two days before trial was actually held, with Sgt. Gore running the videotape player. Defendant viewed the portion of the video showing the actual transaction five or six times, but saw only a portion because Sgt. Gore mistakenly believed that segment to be the entirety of the videotape involving defendant. However, another part of the tape showed the initial contact between the defendant and Agent Jackson and the confidential informant.
On the morning of the trial, Sgt. Gore discovered his mistake and immediately contacted the D.A.'s office to notify prosecutors of the error. The State in turn notified the defense, who viewed the remainder of the videotape approximately one hour before trial.
At the opening of trial, defendant timely objected to the introduction of the part of the videotape not shown him until that morning. The court did not rule immediately, electing to rule later when the tape was actually introduced.
Later, after hearing the full testimony of Sgt. Gore and the direct examination of Agent Jackson, the court overruled defendant's objection. The trial court observed that the trial had originally been set for November 15, 1993, yet defendant apparently made no attempt to view the tape until that date. Thus, the defendant's position on the actual trial date, November 17, was no different than if the trial had opened on the date originally set (i.e., going to trial having just seen the police videotape).
The trial court specifically found no bad faith actions by the State and no prejudice to the defendant.
Pretrial discovery of documents and tangible objects is governed by La.C.Cr.P. art. 718, which states:
Subject to the limitation of Article 723, on motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect, copy, examine, test scientifically, photograph, or otherwise reproduce books, papers, documents, photographs, tangible objects, buildings, places, or copies or portions thereof, which are within the possession, custody, or control of the state, and which:
(1) are favorable to the defendant and which are material and relevant to the issue of guilt or punishment, or
(2) are intended for use by the state as evidence at the trial, or
(3) were obtained from or belong to the defendant.
The court may determine whether evidence is subject to the provisions of Paragraph (1) hereof by in camera inspection.
The duty to disclose is a continuing one, under La.C.Cr.P. art. 729.3:
If, subsequent to compliance with an order issued pursuant to this Chapter and prior to or during trial, a party discovers additional evidence or decides to use additional evidence and such evidence is or may be, subject to discovery or inspection under the order issued, he shall promptly notify the other party and the court of the existence of the additional evidence, so that the court may modify its previous order or allow the other party to make an appropriate motion for additional discovery or inspection.
Failure to comply with disclosure duties is governed by La.C.Cr.P. art. 729.5, which provides:
A. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.
B. In addition to the sanctions authorized in Part A hereof, if at any time prior or subsequent to final disposition the court finds that either the state through the *677 district attorney or assistant district attorney or the defendant or his counsel has willfully failed to comply with this Chapter or with an order issued pursuant to this Chapter, such failure shall be deemed to be a constructive contempt of court.
The cases connected with these articles indicate that even when the State fails to disclose evidence on discovery, reversal is not necessary where there is no showing of bad faith or prejudice to the defendant's case. See State v. Anderson, 440 So.2d 205 (La. App. 3 Cir.1983), writ denied, 444 So.2d 1241 (La.1984). We find defendant effectively conceded that the State was not in bad faith, therefore the remaining issue is whether defendant's case was prejudiced by his not viewing the full videotape. Prejudice is what defendant argues on appeal.
A reading of the record indicates that the trial judge fully explored the potential negative consequences of admitting the full tape into evidence. The judge had initially expressed strong reservations as to admitting the full tape, and only did so after taking full testimony from Sgt. Gore (the officer who played the videotape for defendant, and who was also the officer in charge of the drug investigation) and the direct examination of Agent Jackson, the officer who "made the buy" that formed the basis for defendant's arrest and trial.
When the trial court made its decision to overrule defendant's objection to the admission of the full tape, the court made clear that it had considered both the prejudice and the bad faith issues as to non-disclosure by the State.
The court specifically addressed the prejudice issue and found none. As the court stated, the defendant's position was not changed by the unviewed portion of the tape. As this circuit has previously stated, reversal and new trial is required only if there is a reasonable possibility that the error complained of might have contributed to the conviction, defendant must show prejudice before his conviction will be reversed. State v. Montgomery, 575 So.2d 471 (La.App. 3 Cir.1991) and cases cited therein.
A review of the videotape identified as S-8 in full, reveals that the defendant could reasonably be identified from either the portion of the video showing his initial approach to Agent Jackson's truck, or the portion showing the actual "buy." See also the copies of photographs, identified as S-6, of the defendant. We find defendant has made no showing of prejudice; hence, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3:
By this assignment, defendant alleges that the trial court erred by allowing the certificate from the Northwest Crime Lab in Alexandria to be introduced into evidence.
At trial, the defendant objected to the introduction of the crime lab certificate based upon La.R.S. 15:499, which states:
A. All criminalistics laboratories established by laws of this state or by laws of the United States, and all coroners, forensic pathologists, and other persons, partnerships, corporations, and other legal entities practicing in fields of knowledge and expertise in the gathering, examination, and analysis of evidence by scientific means are authorized to make proof of examination and analysis of physical evidence by the certificate of the person in charge of the facility in which such examination and analysis is made. Such certificate shall list:
(1) The date and time such evidence was delivered to such facility.
(2) The name of the person making such delivery, and the person receiving same.
(3) A brief description of the evidence.
(4) The type of examination or analysis requested.
(5) The name of the person making the examination or analysis.
(6) The date or dates of the examination or analysis.
(7) The results of the examination or analysis.
B. The certificate shall give the name and address of the facility in which the examination or analysis was made, and shall be signed by the person making the *678 examination or analysis and by the person in charge of the facility.
In defendant's own words, the thrust of his objection "is that the certificate must be in strict conformity with the provisions of R.S. 15:499 [sic] in order for it to be admissible."
Despite the mandatory language of the statute, we find La.R.S. 15:499 is primarily an enabling statute which "relieves crime lab personnel from the necessity of appearing at trial when there is no real question or issue surrounding the validity of the analysis performed by the crime lab technician." See: State v. Mims, 524 So.2d 526, 536 (La. App. 2 Cir.), writ denied, 531 So.2d 267 (La.1988).
La.R.S. 15:500 states:
In all criminal cases and in all cases in juvenile or family courts which are of a criminal nature, and in civil forfeiture proceedings arising from criminal activity, the courts of this state shall receive as evidence any certificate made in accordance with R.S. 15:499 subject to the conditions contained in this Section and R.S. 15:501. The certificate shall be received in evidence as prima facie proof of the facts shown thereon, and as prima facie proof of proper custody of the physical evidence listed thereon from time of delivery of said evidence to the facility until its removal therefrom.
There is no real question in this case as to either the validity of the lab analysis or as to the chain of custody. As stated in his brief, defendant's argument rests on a very strict interpretation of La.R.S. 15:499. As the trial judge pointed out, the lab certificate contains the pertinent information required by the statute. Clearly, the lab received the substance in question through a proper chain of custody, analyzed the substance, and identified it as crack cocaine.
Although the time of day of delivery to the facility is not noted, the time and date of delivery to T.J. Shuflin personally is noted on the certificate. Defendant does not dispute that T.J. Shuflin is the evidence custodian and analyst for Northwest Crime Lab. Mr. Shuflin makes the log entries of receipt of evidence at the lab, therefore delivery to Mr. Shuflin at a certain date and time is, ipso facto, delivery to Northwest Crime Lab.
Defendant also attacks the certificate's listing as to the type of analysis requested. Defendant claims the term "CDS" is too vague for purposes of La.R.S. 15:499. As there is no real question that the lab received the evidence, did in fact test it, and found it to be cocaine, this argument falls short. It is clear that the term "CDS", which in common usage stands for "controlled dangerous substance," was a sufficient notation to signify the need for a cocaine test, especially in light of the physical description of the substance delivered to the lab.
Defendant's present arguments are similar to those made by the appellant in Mims, supra, at 536-537, wherein Mims argued the lab certificate was in improper form since it did not specify that the substance analyzed and identified as marijuana was an illegal type of marijuana. The Mims court reasoned that such an argument was "specious at best," as the substance had been clearly identified as marijuana and marijuana in any form is clearly illegal. (Id. at 540-541).
Defendant's argument ignores the purpose of the statute. He does not dispute that the substance received from him was properly identified as crack cocaine, nor does he allege prejudice. As the defendant's argument is based solely upon a hypertechnical reading of the statute, we find this assignment of error to be without merit.

ASSIGNMENTS OF ERROR NOS. 1 AND 4:
These assignments of error both concern sufficiency of the evidence. In his first assignment of error, defendant alleges that the trial court erred in reaching a guilty verdict, as the evidence did not support the State's burden of proving defendant's guilt beyond a reasonable doubt.
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of *679 fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559, at 563 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See: State ex rel. Graffagnino, supra, citing State v. Richardson, 425 So.2d 1228 (La.1983).
In order for the State to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt.
La.R.S. 40:967(A)(1) provides:
Except as authorized by this Part or by Part VII-B of Chapter 5 of Title 40 of the Louisiana Revised Statutes of 1950, it shall be unlawful for any person knowingly or intentionally:
(1) To produce, manufacture, distribute, or dispense or possess with intent to produce, manufacture, distribute, or dispense, a controlled dangerous substance classified in Schedule II;
La.R.S. 40:964 Schedule II(A)(4) lists, in pertinent part:
Unless specifically excepted or unless listed in another schedule, any of the following substances whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:
* * * * * *
Coca leaves, cocaine, ecgonine and any salt, isomer, salt of an isomer, compound, derivative, or preparation of coca leaves, cocaine or ecgonine and any salt, isomer, salt of an isomer, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine.
As the facts have already been recounted in detail, they will not be repeated here. Defendant's appeal focuses on the act element of the charged crime.
Pursuing his argument, defendant reasons that Army Special Agent Jackson's testimony was so unclear as to the date of the offense that a reasonable doubt arises as to defendant's guilt. The defendant's argument focuses on the following colloquy during re-cross examination:
BY MR. SIMMS:
Q. Mr. Jackson, when did you become aware that you had made a mistake and told the court the wrong dates? When did you realize that?
A. When I (INAUDIBLE), sir.
Q. Sir?
A. When I said it.
Q. Well, now wait a minute, didn't you have an opportunity to say wait a minute I made a mistake, that wasn't the last thing that I asked you, was it?
A. I don't know why I didn't respond at the time, sir.
Q. You mean you realized you made a mistake but you went through the rest of the cross examination and you didn't say, wait I made a mistake? Is that what you are testifying to now?
A. I don't know why I said the 15th and 16th, sir, I don't.
Q. You also don't know why you didn't correct it right then, do you?
The defense counsel and Agent Jackson then went into further details:
Q. Can you find the month of June?
A. Of course, I can, sir.
Q. I assumed that you could, but, would you please do that for me?
A. Right here, sir.
Q. Do you see the 15th and 16th on there?
A. Yes sir.
Q. What days of the week do they fall on?
A. Tuesday and Wednesday.

*680 Q. What day of the week does the 19th fall on?
A. A Saturday, sir.
Q. You are sure of that?
A. I can see it plain as day, sir.
Q. When did you become aware that you had also made a mistake on the days of the week that you told me or are you aware of that yet?
A. I told you sir, I wasn't sure if it was a weekend. I said I didn't think it was a weekend, I didn't think it was a Saturday. I knowcan I qualify this?
Q. Sure.
A. I know that we do not go outI know in the past we have not gone out on a Saturday evening and I should have said that's what I was implying that we do not set up our operations on a Saturday evening.
Q. So, if it fair to assume that at the time you testified before lunch under my cross examination that you did not realize that that was a mistake or that you did, when you told me it was during the week?
A. It was a mistake on my part.
Q. When did you realize that?
A. As I said when you cross examined me I wasn't sure of the part of the week it was, sir.
Q. But, you didn't say you weren't sure, did you?
A. I said I didn't think it was on a weekend.
Q. Okay. I'm going to show you this envelope which is already in evidence and ask you to look at the writing on it, is that on the bag itself or on the window of this big envelope, can you tell?
A. All of the writing is on the plastic bag not the window of the envelope.
Q. On the plastic bag inside the envelope, is that correct?
A. Yes sir.
Q. And, who put all of that writing on there?
A. My writing appears on the side that is reversed, the side that is on the back part of this envelope.
Q. Okay, we can't see that, can we?
A. I can read it, sir?
Q. Can you?
A. Yes sir.
Q. Well, what does it say?
A. These are my initials up top, backwards RWJ, here is the time and here is the date the 19th of June.
Q. What does the time say?
A. NineteenthI'm sorry, the time says one forty-five.
Q. One forty-five?
A. Correct.
Q. What time does that refer to?
A. To me it refers to a quarter to two in the morning.
Q. Yes sir, I understand that but is that the time that you got this from the man or the time you gave it to somebody or just what does it mean?
A. It refers to the time that I obtained the evidence.
Q. That you obtained it?
A. Correct.
Q. I'm going to show you State's Exhibit Three and ask you if you can identify that, have you seen that before?
A. Yes sir.
Q. Do you see your signature on there anywhere?
A. Yes sir.
Q. Where?
A. Line one, item number one, relinquish buy, first block.
Q. Right below your name, is that right?
A. Yes sir.
Q. What is the date by that?
The witness, Agent Jackson, then identified the date written as the 19th. We note that the defendant's own cross-examination showed that the evidence bag was correctly dated, bolstering Agent Jackson's testimony. Further, Sgt. Gore identified the 19th as the date of the operation. Although Gore did not meet the defendant face-to-face, he was in charge of the operation on the night of the "buy."
In any event, Agent Jackson's confusion goes to the weight of the evidence and not its *681 sufficiency, as the argument attacks the witness's credibility. See: State v. Voorhies, 590 So.2d 776, 778 (La.App. 3 Cir.1991).
A determination of the weight of the evidence presented is a question of fact. Where conflicting testimony exists, the resolution of the matter requires a determination of credibility of the witness and is a matter of weight of the evidence and not sufficiency. Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. State v. Nolan, 503 So.2d 1186 (La.App. 3 Cir.1987), writ denied, 507 So.2d 226 (La.1987).
A fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Jackson, 443 U.S. at 319, 99 S.Ct. at 2789. Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. See: State v. Mussall, 523 So.2d 1305, at 1310 (La.1988).
Even if a credibility attack were not outside the province of a Jackson review, the fact that the evidence bag containing the cocaine was initialed and dated on the night/early morning of the crime lends credence to Agent Jackson's testimony. Also, the State introduced video and audio tapes of the transaction. Thus, we conclude a rational trier of fact could have found from Agent Jackson's testimony that the defendant committed the crime charged, unlawful distribution of cocaine, on the date and time alleged.
As for defendant's fourth assignment of error, it is also based upon Agent Jackson's misstatement of the date of the "drug buy." For the reasons already stated, this argument also goes to weight rather than sufficiency. The trial court heard Agent Jackson's full testimony regarding the transaction, including his misstatement of the date of the "buy." As the weighing of evidence is within the sound discretion of the trier of fact, we also find this assignment of error to be without merit. State v. Fann, 597 So.2d 1230 (La.App. 3 Cir.1992).
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.
NOTES
[*] Judge Lucien C. Bertrand, Jr., Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.